MONIQUE C. WINKLER (Cal. Bar No. 213031)
SUSAN F. LAMARCA (Cal. Bar No. 215231)
  lamarcas@sec.gov
JENNIFER J. LEE (Cal. Bar No. 261399)
  leejen@sec.gov
DAVID ZHOU (NY Bar No. 4926523)
  zhoud@sec.gov
ANTHONY J. MORENO (Cal. Bar No. 219220)
  morenoa@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile:  (415) 705-2501

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GRANITE CONSTRUCTION, INCORPORATED,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("the Commission" or "the SEC") alleges:

## SUMMARY OF THE ACTION

1.      This case involves financial reporting and accounting fraud carried out by a former executive at Granite Construction, Incorporated ("Granite"), an infrastructure-construction company based in Watsonville, California.  From 2017 until his departure in October 2019, Dale Swanberg served as the group leader and senior vice president for Granite's largest civil engineering projects, which included the construction of highways, bridges, and mass transit centers.  During that time, Swanberg faced demands within Granite to turn around the flagging performance and improve the

financial metrics of his group, the Heavy Civil Group, which was one of Granite's major subdivisions.  In response, Swanberg orchestrated a scheme to conceal the deteriorating performance of the Heavy Civil Group by improperly deferring the recording of additional costs that arose on significant projects.

2.    Granite's policies and procedures and internal accounting controls required the construction teams within the Heavy Civil Group to put together a forecast for each project at the end of each quarter that was supposed to accurately estimate the total cost upon completion of construction (referred to herein as the "total expected costs").  The total expected costs were then plugged into Granite's general ledger that calculated both the revenues and the profit margins of the Heavy Civil Group's projects.  But Swanberg manipulated the Heavy Civil Group's financials by directing his subordinates to use specific, rosier than justified profit margin numbers, or to defer recording certain increases to the total expected costs, which had the effect of overstating revenues and profit margins.

3.    Swanberg's scheme to manipulate profit margins and defer the recognition of expected cost increases led to Granite materially misstating its financial results.  In particular, Granite materially overstated its revenue by approximately $62 million over several quarters of 2017 and 2018, and materially understated its revenue in other quarters of 2018 and 2019.  After Swanberg's scheme was publicly disclosed, the price of Granite's stock cratered.  From October 2019 to March 2020, Granite stock price declined from a high of almost $35 per share to a low of approximately $12 per share.

4.    Based on the foregoing, Granite, through Swanberg, violated the antifraud provisions of the federal securities laws.  Specifically, Granite violated 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Granite also violated Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

5.      The Commission requests, among other things, that the Court: (i) permanently enjoin Granite from further violating the federal securities laws as alleged in this complaint; and (ii) order Granite to pay civil monetary penalties.

**JURISDICTION AND VENUE**

6.      The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.      Granite, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

9.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District.  Granite is based in this District and filed its incorrect financial statements from its headquarters.  The relevant offers and sales of securities also took place in this District.

10.      Under Civil Local Rule 3-2(e), this civil action should be assigned to the San Jose Division because a substantial part of the events or omissions that give rise to the claims alleged herein occurred in Santa Cruz County, where Granite's principal place of business is located.

**DEFENDANT**

11.      **Granite Construction Incorporated** is a Delaware corporation headquartered in Watsonville, California.  Granite's common stock is registered with the Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 and is traded on the New York Stock Exchange under the symbol "GVA."  Granite files and furnishes periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

**FACTUAL ALLEGATIONS**

**I.      The Struggles of Granite's Heavy Civil Group**

12.      Granite, which was founded in 1922 and has been publicly traded since 1990, is a national infrastructure construction company that offers general contractor and construction management services, and also produces and sells construction materials.  Granite's construction projects include public and private highways, bridges, roads, tunnels, and airports.

13.      Through at least 2019, the company's largest projects were grouped together within the Large Projects Group, which was renamed the Heavy Civil Group in 2018.  The group was an important subdivision for Granite, making up approximately one quarter of the company's reported revenues from 2017 through 2019.  Thus, the performance of the Heavy Civil Group had a significant impact on Granite's revenues and profit margin.  A recorded increase in the total expected costs of the Heavy Civil Group's projects decreased the revenues and profit margins of both the group, and the company as a whole.

14.      For years, the Heavy Civil Group had struggled to manage costs on its projects and improve its profit margin, and it had attracted the scrutiny of investors and analysts.  At the end of the first quarter of 2017, Granite's senior management explained during a call with Wall Street analysts that the Heavy Civil Group's "results will steadily improve" in the next two years because a number of older, poorly performing projects would be completed in 2018.  During the same call, Granite's senior management also announced that Swanberg had been promoted to lead the Heavy Civil Group and that, as "a seasoned veteran in the industry, who has led successful large project businesses in the past," Swanberg was "focused on returning this business back to its appropriate mid-teens gross [profit] margin levels."  By the end of 2017, Granite's senior management told the market in press releases and conference calls that the Heavy Civil Group, which was shifting its focus to new, smaller projects, would improve its profit margins by the end of 2018.

**II.     Determining and Accounting for Total Expected Costs**

15.     Granite was required to prepare financial statements in conformity with generally accepted accounting principles ("GAAP"), and stated in its annual reports filed with the Commission on SEC Form 10-K that its financial statements were in fact prepared in conformity with GAAP.

16.     Granite derived its revenue from construction contracts that can span several quarters or years.  Granite recognized the total revenue over time using what is known as a "percentage of completion" method that is based on costs.

17.     As disclosed by Granite in its critical accounting policies, the percentage of completion is calculated by taking the actual costs incurred to date and dividing by the total expected costs when the project is finished.  The actual costs are an objective number measuring all incurred project expenses, including but not limited to submitted bills and invoices.  The total expected costs are required to be calculated based on accurate estimates made by construction personnel based on their operational expertise and judgment, using historical cost and construction data, in accordance with Granite's prescribed process.

18.     The project's revenue recognized each period is then determined by multiplying the total contract amount and the percentage of completion.  As a result, a lower estimation of the total expected costs to complete a project would result in a higher percentage completion ratio and thus an overstatement of recognized revenues.

19.     Granite's policies and procedures and internal accounting controls required the project teams in the Heavy Civil Group to prepare a quarterly project forecast that included an estimate of the total expected costs.  To determine the total expected costs, project teams were required to perform a detailed bottom-up analysis of all the costs and make accurate estimates about the quantities and values of each cost line item.  Granite explained this process in its Forms 10-K for fiscal years 2017 and 2018.

20.     However, Granite gave Swanberg, as head of the Heavy Civil Group, ultimate control over the group's forecasts.  He had final approval authority over forecasts and exclusively determined adjustments to the total expected costs before submitting to corporate accounting.  Granite's

1  corporate accounting and finance personnel had no role in creating or approving the estimates and no

2  basis for assessing their accuracy.

3      21.     After Swanberg signed off, the forecasts were sent to Granite's corporate accounting

4  personnel, who recorded the forecast numbers into the general ledger that calculated the reported

5  revenues and profit margins. Because the inputs into the general ledger required no additional review

6  from Granite's corporate accounting personnel, the reported revenues of the Heavy Civil Group each

7  quarter were accurate only if Swanberg and his teams reported accurate figures in their forecasts.

8      22.     In addition, Granite's policies and procedures and internal accounting controls

9  required Swanberg to perform the final review of project forecasts each quarter and sign a

10  certification that attested to the accuracy of the project forecasts.

11      23.     At all relevant times, Swanberg reviewed and approved the quarterly project forecasts

12  of the Heavy Civil Group.  Swanberg also signed certifications each quarter attesting to the accuracy

13  of those forecasts, which Granite's senior executives relied upon in signing Granite's quarterly and

14  year-end filings with the SEC.

15  **III.     Granite Improperly Manipulated and Deferred Total Expected Costs to Improve**

16  **Revenues and Profit Margins**

17      24.     Beginning in 2017 through 2019, Swanberg faced continual pressure from within

18  Granite to turn around the operational underperformance and improve the financial metrics of the

19  Heavy Civil Group.  In this timeframe, however, the Heavy Civil Group continued to experience

20  significant increases in expected costs to complete on a number of projects.  These increases in

21  expected costs—if recognized—would have the effect of reducing the Heavy Civil Group's revenues

22  and profit margins.

23      25.     Faced with these competing demands, Swanberg orchestrated a scheme to hide the

24  deteriorating performance of his group's projects.  During the scheme, Swanberg directed his

25  subordinates to improperly manipulate profit margins and defer the total expected costs of numerous

26  projects in the group.  As some examples of his misconduct:

27      a.     On a major bridge-construction project, Swanberg fraudulently dictated the reported

28  profit margins, despite the fact that those numbers were not justified based on the project team's

estimate of the total expected costs.  For instance, in or about January 2019, Swanberg acknowledged in emails and in-person meetings that his project team had concluded that total expected costs were going to increase dramatically by tens of millions of dollars from prior estimates.  Nonetheless, Swanberg dictated what the profit margins for the project would be, and his subordinates then backfilled the forecasted numbers so they would add up to the predetermined margin.  Moreover, throughout 2019, Swanberg and the project team maintained and reviewed two contradictory versions of the cost reports for the project—the first version tracked the team's true and accurate estimates of the total expected cost, while the other version contained the fraudulent, significantly lower total expected cost numbers that were reported in the quarterly forecasts certified by Swanberg and used to prepare Granite's publicly reported financials.

b.      On another bridge-construction project, Swanberg became aware that his subordinates were not performing the detailed review of project forecasts in the first quarter of 2018 and 2019 because performing such a review would lead to increases in total expected costs.  Despite knowing that the project team was disregarding Granite's policies and procedures, Swanberg did not require his employees to perform such a review in order to avoid the forecasting of these increases in expected costs because that would call into question the accuracy of the prior fiscal year-end numbers.  He approved these project forecasts despite knowing that they understated total expected costs.

c.      In connection with a dam-construction project, Swanberg directed his subordinates to spread a $3 million increase in total expected costs evenly across three quarters, as opposed to taking the increase in the quarter when the increased costs were forecasted by the project team.  Swanberg directed his subordinates in the Heavy Civil Group to improperly delay or defer these increases in the expected future costs to reduce the impact to the group's revenues and profit margins.

26.      Over the course of his fraudulent scheme to improve the Heavy Civil Group's revenues and profit margins, Swanberg knew or was reckless in not knowing that the forecasts he reviewed, approved, and certified were inaccurate and did not adhere to Granite's policies and procedures or its internal accounting controls.  Among other things, Swanberg attended trainings and received company documents explaining how to properly estimate expected costs and prepare project

forecasts.  Nonetheless, he directed his subordinates to report specific, unsupportable profit margins, and to defer the recognition of certain cost increases.

27.     Based on the foregoing, Granite, through Swanberg, materially misstated its revenues and profit margins from 2017 through the third quarter of 2019.  In particular, Granite, through Swanberg, materially overstated its revenue by approximately $62 million over several quarters of 2017 and 2018, and materially understated its revenue in other quarters of 2018 and 2019.

**IV.   Granite's Offerings**

28.     During the relevant period, Granite conducted offers and sales of its securities.  For example, in or around June 2018, Granite offered its stock as consideration for the over $500 million acquisition of a water infrastructure company.  Granite also sold stock to its employees via its Employee Stock Purchase Plan registered pursuant to a Form S-8.

**V.    Swanberg's Scheme Unraveled and Granite Restated Its Financials**

29.     Ultimately, Swanberg's scheme unraveled as several projects neared completion and the manipulated estimates of total expected costs were exposed by the much higher actual, incurred costs.  The group recognized the increases in total expected costs, which could no longer be manipulated or delayed.  After the Heavy Civil Group suffered significant writedowns of its profit margins in the second and third quarters of 2019, Granite terminated Swanberg.  At this time, Granite engaged in self-policing and took steps to analyze and identify improvements to the forecasting process.

30.     In or around January 2020, Granite management received internal complaints that questioned the accuracy of the project forecasts on one of the Heavy Civil Group's projects.

31.     Within weeks, Granite self-reported potential revenue recognition issues to the Commission and initiated an internal investigation that ultimately examined significant projects within the Heavy Civil Group.

32.     In or around February 2021, Granite filed its annual report on Form 10-K, which restated its previously reported financial statements for each quarter from the first quarter of 2018 through the third quarter of 2019, and also restated its year-end results for 2017 and 2018.

33.     Granite disclosed that its revenues had been overstated by approximately $31 million in 2017 and approximately $31 million 2018.  Because that revenue had been recognized too early, Granite's revenues in the first three quarters of 2019 were understated by approximately $62 million.

34.     Granite's overstatement of revenues concealed the deteriorating performance of the Heavy Civil Group for much of the relevant period.  Granite, through Swanberg, acted with scienter in issuing materially false and misleading financial statements, earnings releases, and other documents filed with the Commission because Swanberg, in his capacity as Granite's senior vice president, knew or was reckless in not knowing that he had repeatedly understated the Heavy Civil Group's total expected costs and yet certified the accuracy of the project forecasts, and thus, overstated its revenues.

35.     Granite also disclosed that it had identified a material weakness in its internal control over financial reporting, which contributed to the restatement.  Among other things, Granite identified material weaknesses related to the failure to incorporate an appropriate level of review over the project forecasts from individuals independent of the Heavy Civil Group.  Ultimately, the controls and policies did not prevent the manipulation of total expected costs to improve profit margins and revenues and enabled Swanberg to falsify Granite's books and records regarding its total expected costs and other financial information.

36.     In remediating, Granite redesigned its policies and procedures and internal accounting controls to increase the transparency and accuracy of the Heavy Civil Group's project forecasts and to provide additional oversight by other members of Granite's management and corporate accounting regarding the finalized project forecasts.  Granite also terminated several employees of the Heavy Civil Group who failed to perform the detailed "bottom up" analysis for project forecasts, and added a chief accounting officer and two new board members to provide enhanced oversight of the project-forecasting process.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5

37.     The Commission realleges and incorporates by reference paragraphs 1 through 36.

38.     Granite, through Swanberg, by engaging in the acts and conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

       a.     Employed devices, schemes, or artifices to defraud;

       b.     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

       c.     Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

39.     By reason of the foregoing, Granite violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### (Violations of Section 17(a) of the Securities Act)

40.     The Commission realleges and incorporates by reference paragraphs 1 through 36.

41.     Granite, through Swanberg, by engaging in the acts and conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means of instruments of transportation or communication in interstate commerce or by use of the mails,

       a.     With scienter, employed devices, schemes, or artifices to defraud;

       b.     Obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

       c.     Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

42.     By reason of the foregoing, Granite violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

1

**THIRD CLAIM FOR RELIEF**

2

**(Violations of Exchange Act Reporting Requirements)**

3

43.     The Commission realleges and incorporates by reference paragraphs 1 through 36.

4

44.     As an issuer of securities registered with the SEC, Granite was required to file with the

5

SEC annual, quarterly, and current reports, in accordance with applicable rules and regulations,

6

which included information as necessary to make the statements made in the reports, in the light of

7

the circumstances under which they were made not misleading.  By the conduct described above,

8

Granite failed to do so, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and

9

Rules 13a-1, 13a-11, 13a-13, and 12b-20 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, 240.13a-

10

13, and 240.12b-20].

11

**FOURTH CLAIM FOR RELIEF**

12

**(Violations of Exchange Act Books and Records Requirement)**

13

45.     The Commission realleges and incorporates by reference paragraphs 1 through 36.

14

46.     As an issuer of securities registered with the SEC, Granite was required to make and

15

keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the

16

transactions and disposition of the assets of Granite. By the conduct described above, Granite failed

17

to do so, in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

18

**FIFTH CLAIM FOR RELIEF**

19

**(Violations of Exchange Act Internal Controls Requirements)**

20

47.     The Commission realleges and incorporates by reference paragraphs 1 through 36.

21

48.     As an issuer of securities registered with the SEC, Granite was required to devise and

22

maintain a system of internal accounting controls sufficient to provide reasonable assurances that

23

Granite's corporate transactions were executed in accordance with management's authorization and

24

in a manner to permit the preparation of financial statements in conformity with GAAP pursuant to

25

Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].  By the conduct described above,

26

Granite failed to do so, in violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §

27

78m(b)(2)(B)].

28

1   **PRAYER FOR RELIEF**

2   WHEREFORE, the Commission respectfully requests that the Court:

3   I.

4   Enter an order permanently enjoining Granite from directly or indirectly violating the

5   applicable provisions and rules of the federal securities laws as alleged and asserted above.

6   II.

7   Enter an order requiring Granite to pay civil penalties pursuant to Section 20(d) of the

8   Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

9   III.

10   Retain jurisdiction of this action in accordance with the principles of equity and the Federal

11   Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

12   may be entered, or to entertain any suitable application or motion for additional relief within the

13   jurisdiction of this Court.

14   IV.

15   Grant such other and further relief as this Court may determine to be just and necessary.

16

17   Dated: August 25, 2022                    Respectfully submitted,

18

19                                            /s/  *Anthony J. Moreno*
                                              Anthony J. Moreno
20                                            Attorney for Plaintiff
                                              SECURITIES AND EXCHANGE COMMISSION

21

22

23

24

25

26

27

28

COMPLAINT                                12